**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**DISTRICT TITLE**

                    **Plaintiff**

**v.**

**ANITA K. WARREN**

                    **Defendant**

                                    **1:14-cv-1808 ABJ-DAR**

---

**OBJECTION TO MAGISTRATE JUDGE'S ORDER**

**RENEWED REQUEST FOR A PROTECTIVE ORDER**

In accordance with Civil Rule 72 and 28 U.S.C. § 636, attorney Matthew LeFande hereby objects to magistrate judge Deborah Robinson's orders of September 21 and 27, 2017.  ECF Docket # 121.  This objection is brought within fourteen days of the issuance of the offending orders.

In support of this Objection, the attorney states the following:

STATEMENT OF FACTS

1.      On September 2, 2014, District Title filed suit in the District of Columbia alleging that District Title unilaterally overpaid Debtor Anita K. Warren in a real estate settlement transaction.  Warren's son, Timothy Day was named as the sole co-defendant. *Id*.

2.      On November 20, 2014, Day, sold an unrelated property in Scotland, Maryland.  The property purchaser obtained a mortgage for the property through Quicken

Loans, a large commercial lender.  The original purchase price was reduced to the final

purchase price after the purchaser was unable to obtain an appraisal for the property at

the purchase price and obtain commensurate financing.  The property purchaser was able

to obtain title insurance and a warranty title following a third party title search.

  3.  On December 15, 2014, the District Court granted District Title a

preliminary injunction over the Defendants' opposition.  ECF Docket # 21.  The

Defendants timely appealed.  *Warren v. District Title*, 14-7196.

  4.  On June 17, 2015, District Title filed suit in the Circuit Court of Saint

Mary's County Maryland, claiming a fraudulent conveyance in the Scotland, Maryland

transaction, despite there being a mortgage obtained by the purchaser for the property at

the maximum amount permitted by the lender.  *District Title, Inc. v. Day*, 18-C-15-

000820-ER.

> Quicken Loans entered an appearance and moved to dismiss.
>
> Day became the record owner of the Scotland Property - the property at issue in this case - back in 2008, by virtue of a June 18, 2008 deed from Warren to Day... Therefore, Day was the owner of the Scotland Property before the dispute with District Title began in 2014.  On November 20, 2014, Day sold the Scotland Property to Ashburn for $89,000.00. (Compl. at 38.)  This was *before* the court in the D.C. Litigation entered the Preliminary Injunction Order. (Id. at 31 and Ex. 3.) Ashburn purchased the Scotland Property using the proceeds of a loan he obtained from Quicken Loans. (Id. at 38.) The loan was secured by a deed of trust (the "Deed of Trust"), on the Scotland Property, which named Lyon as the trustee, and MERS as the named beneficiary as nominee for Quicken Loans, its successors and assigns. (Id. at 36.)...
>
> The timing and sequence of events is important to this motion. The Deed of Trust on the Scotland Property was recorded in the land records for St. Mary's County on January 13, 2015.  (Compl. at 39.) District Title did not record the Preliminary Injunction Order from the D.C. Litigation in the land records of St. Mary's County until January 23, 2015 - two months *after* the sale of the Scotland Property, and ten days *after* the Deed of Trust was recorded. (ld. at 38.)

Quicken Loans Mot. to Dismiss Mem. at 5.

> In Count I, District Title purports to assert a claim against Moving Defendants based on the Maryland Uniform Fraudulent Conveyance Act, (MD. CODE, Comm. Law, 15-201, *et seq.)* (the "MUFCA"). Count I fails as a matter of law. There are no bases alleged in the Complaint to support the conclusion that the sale of the Scotland Property by Day to Ashburn was fraudulent, or intended to hinder,delay, or defraud Day's purported creditor, District Title. Moreover, even if Day were District Title's supposed debtor (which, based on the facts alleged, he is not), Ashburn gave fair value in consideration for the purchase of the Scotland Property.

*Id*. at 16.

> District Title alleges that ***Warren,*** Day's mother, was inadvertently wired the funds intended for Wells Fargo. (Compl. at, 17.) District Title admits that it was not until December 15, 2014, that Day was under any order enjoining him from conveying any property, or using any personal funds. Therefore, at the time of the sale of the Scotland Property from Day to Warrant, District Title was *not* Day's creditor, nor was Day subject to any court order as it pertains to the Scotland Property.

> District Title also contends that the consideration paid by Ashburn for the Scotland Property (based on loan proceeds from Quicken Loans), was "far below the actual value of the Property." (Compl. at 51.) The Complaint contains no factual basis to support this conclusory allegation, and as such, it cannot withstand this Motion to Dismiss.

*Id*. at 18 (emphasis *sic*, citation omitted).

5.      District Title alleges that it "served, by posting, a subpoena, a Notice of Deposition *De Bene Esse*, and a Subpoena to Person Under Foreign Subpoena issued by the Clerk of Court for Arlington County upon Matthew LeFande on December 6, 2016, for a deposition *de bene esse* prior to the trial held in St. Mary's County." *Id*. at 4 (citing Pl.'s Ex. 6). District Title made no attempt to enforce the purported subpoena in the St. Mary's lawsuit. On December 12, 2016, District Title lost the St. Mary's proceeding following a jury trial as to those Defendants which appeared.

6.      Judgment was entered against Warren and Day on November 13, 2015 in this case. ECF Docket # 80.

7.     On March 22, 2016, Plaintiff moved for Oral Examination and Leave to Serve Subpoenas.  District Title filed exhibits demonstrating its knowledge of the transfer of funds to a New Zealand entity known as Escrow Hill Limited from the Scotland, Maryland real estate closing.  ECF Docket # 88-8, 88-9, 88-10.  District Title failed to disclose when it received such information.  The discovery sought included leave to issue subpoenas to Defendant Day and named third parties, including Attorney LeFande and Escrow Hill Limited.  ECF Docket # 88-1 at 6.

8.     On December 3, 2016, a letter rogatory was issued requesting assistance from the courts in New Zealand.  ECF Docket # 105.  No information appears in the record regarding the results of that request.

9.     This Court then issued a subpoena to Attorney LeFande demanding his deposition regarding the St. Mary's real estate transaction, itself unrelated to the District Title transaction, in which District Title claimed LeFande was present at a time he was representing Day in the present case.  ECF Docket # 110.  LeFande made a timely objection to the Order.  ECF Docket # 111.

10.    Attorney LeFande was never served with any such subpoena.

11.    Day died on or about April 6, 2017.  A suggestion of death was made upon the record on April 12, 2017.  On that same date that the suggestion of death was entered, the Maryland Court in the St. Mary's proceeding entered a default judgment against Day for his failure to defend the St. Mary's proceeding.

12.    District Title made no attempt to substitute a party for the Decedent Day within the time limitations of Federal Civil Rule 25.

13.     District Title made no motion to extend time to substitute Day as a party Defendant.

14.     Despite the complete absence of any service of process upon him, this Court ordered Attorney LeFande to appear for a deposition.  ECF Docket # 115.

15.     On September 18, 2017, LeFande moved to dismiss Day as a party defendants as he had been apparently dead since April of 2017 and no effort had been made to substitute a party or open his estate.  ECF Docket # 117.

16.     This Court again ordered Attorney LeFande to appear for a deposition on September 21, 2017, again with no suggestion of any service of process upon him. Minute Order of September 18, 2017.  The Minute Order specifically identified Antia Warren as "still a proper defendant in this case" and insinuated that any post-judgment discovery was now directed to her as a party.  *Id.*

17.     Warren filed her petition bankruptcy in the United States Bankruptcy Court for the District of Maryland on September 19, 2017.  A suggestion of bankruptcy was filed upon the record in this case on that date.  ECF Docket # 118.

18.     In response to Warren's bankruptcy, this Court denied the dismissal of Day, despite Day appearing to still be dead.

19.     On September 21, 2017, District Title attempted to depose Warren's attorney in execution of the November 13, 2015 judgment.  The attorney refused, citing *inter alia*, the automatic stay in the Bankruptcy case.  Magistrate Judge Deborah Robinson found the attorney in contempt and fined him $5,000.

20.     On September 22, 2017, District Title filed a motion seeking attorney's fees from Warren's attorney, also in execution of the November 13, 2015 judgment.  ECF Docket # 120.

21.     Warren has now moved to Show Cause for Contempt in the Bankruptcy proceeding, for the District Title attorney's and owner proceeding with execution of judgment in violation of the automatic stay.

22.     LeFande has further petitioned the District of Columbia Circuit for a Writ of Prohibition.


ARGUMENT

A party cannot be held in contempt for violation of a void order or an order otherwise made without proper jurisdiction of the Court.  A bankruptcy filing "withdraw[s] from all other courts all power under any circumstances to maintain and enforce" all judicial actions against the debtor, "its Act is the supreme law of the land which all courts -- state and federal -- must observe."  *Kalb v. Feuerstein*, 308 U.S. 433, 439 (1940).  Accordingly, any action taken against a debtor while the stay is in place is void and without legal effect.  *Id.*. See also *Howell v. Thompson*, 839 S.W.2d 92 (Tex. 1992).

> The automatic stay is of broad scope, directing that "all judicial actions against a debtor seeking recovery on a claim that were or could have been brought before commencement of a bankruptcy case, are automatically stayed." …thus, "once triggered by a debtor's bankruptcy petition, the automatic stay suspends any non-bankruptcy court's authority to continue judicial proceedings then pending against the debtor." …Unless relief from the stay is granted, the stay continues until the bankruptcy case is dismissed or closed, or discharge is granted or denied. …Once a stay is in effect, without relief from the bankruptcy court, "the parties themselves [can] not validly undertake any judicial action material to the …claim

against" the debtor.

*LaBarge v. Vierkant*, 240 B.R. 317, 321 (B.A.P. 8th Cir. 1999) (quoting *Constitution Bank v. Tubbs*, 68 F.3d 685, 691 (3d Cir. 1995).

**1.      Anita Warren is the only party Defendant before the District Court.**

"If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties."  FED. R. CIV. P. 25(a).  "The motion for substitution may be made by any party".  *Id*.  "Unless the motion for substitution is made not later than 90 days after the death is suggested upon the record by service of a statement of the fact of the death as provided herein for the service of the motion, the action shall be dismissed as to the deceased party."  *Id*.

"In *Rende v. Kay*, 415 F.2d 983, 986 (D.C. Cir. 1969), the D.C. Circuit held that 'no injustice results from the requirement that a suggestion of death identify the representative or successor of an estate who may be substituted as a party for the deceased before Rule 25(a)(1) may be invoked by those who represent or inherit from the deceased.'"  *Unicorn Tales v. Banerjee*, 138 F.3d 467, 470 (2d Cir. 1998) (parallel citation omitted).  In ***forty-eight years*** since *Rende*, the decision has been roundly criticized by other circuits and no effort has ever been made to amend the Rule to reflect the requirement of identifying a successor in the Suggestion of Death which *Rende* found solely by imputation.  "The rule does not require that the statement identify the successor or legal representative; it merely requires that the statement of death be served on the involved parties." *Unicorn Tales*, 138 F.3d at 470.  "[I]f there was an inability or a significant difficulty in identifying [the decedent's] legal representative or successor, a

motion could be brought under Rule 6(b) to enlarge the time in which to file the motion

for substitution." *Id*.

There has been no attempt to identify a successor representative, and there has

been no motion to extend time to do so.

> [T]he *Rende* court's argument that the suggestion of death must identify the successor representative because Rule 25 was amended to dispel rigidity and provide flexibility is short-sighted.  See *Rende*, 415 F.2d at 985. ***The amendment does not allow courts to be flexible when interpreting the Rule and find requirements that are implicit within the rule***.  Instead, the amendment, in conjunction with the amendment of Rule 6, was designed to provide flexibility in regards to the time periods imposed by Rule 25. Committee Notes to Rule 25 state: "Present Rule 25(a)(1), together with present Rule 6(b), results in an inflexible requirement that an action be dismissed as to a deceased party if substitution is not carried out within a fixed period measured from the time of death. The hardships and inequities of this unyielding requirement plainly appear from the cases."  Accordingly, Rule 6 was amended to allow the time periods of Rule 25 to be extended when necessary.  *Rende*, 415 F.2d at 984. This flexibility provided by Rule 6 is precisely the reason the Second Circuit, and now this Court, holds there is no requirement to identify the successor representative in a suggestion of death.  The courts will grant extensions to protect the parties from the concerns of the *Rende* court when the circumstances justify the extension.

*Ray v. Koester*, 215 F.R.D. 533, 535 (W.D. Tex. 2003) (emphasis added).  See also *In re*

*MGM Mirage Securities Litigation*, 282 F.R.D. 600, 603 (D. Nev. 2012) ("The court in

[*Scott v. Vasquez*, 2009 U.S. Dist. LEXIS 116071 (C.D. Cal. Dec. 9, 2009)] correctly

recognized that the Ninth Circuit has not imposed the requirement of identifying a

successor and the court in Jackson likewise recognized that Rule 25 does not specifically

include this requirement.")

> The *Unicorn Tales* panel held that Rule 25 did not specify who was qualified to give notice of death, did not require the identity of the representative to be included on the notice of death, did not require decedent's estate to be probated before notice of death could be given, and did not require a representative to be selected before the notice of death could be given.  *Id.* at 470.  According to the Second Circuit panel, none of these additional criteria were required under Rule 25 to trigger the 90-day period.  Rather, all that Rule 25 required was service of

the notice of death upon existing parties.

*KOB Inc. v. Brand*, 545 B.R. 37, 43 (Bankr. C.D. Cal. 2016).

> [T]he Court believes that the burden was on the Plaintiff to take appropriate action to prosecute the § 727 action against the decedent's estate by filing an appropriate motion. Assuming that the decedent's representative was unknown, Plaintiff had the obligation to seek to ascertain the identity of such representative through available means. For example, Plaintiff could file an appropriate motion or conduct discovery to ascertain the identity of a proper substitute representative of the decedent. No such efforts were made despite ample opportunity being provided by the Court.

*Id*. at 44.

> Plaintiff cites *Yonofsky*[1] and *Rende v. Kay* in support of the proposition that "the opposing party (*i.e.* the party opposing the decedent) would not have the burden of identifying the personal representative." Those cases, however, do not stand for the proposition that plaintiffs are absolved from taking any action when a defendant dies. Indeed, where a plaintiff dies, it makes little sense to require a defendant to take action to seek out a successor plaintiff. Indeed, it would seem counter-intuitive to place the obligation on a defendant to make arrangements to seek out a representative successor to a deceased plaintiff, unless of course there are valuable counterclaims held by that defendant. Indeed, there are no counterclaims at issue in this § 727 proceeding. Where a defendant dies, the economic incentive to prosecute correctly places the burden on a plaintiff to drive litigation forward. While Plaintiff does not explicitly suggest that it was the surviving codefendant's obligation, Plaintiff offers no other practical solution. Was it the Court's burden?

*KOB Inc.*, 545 B.R. at 44 (citations omitted).

This Court may latch on the idiosyncrasies of *Rende* to proceed in the face of the

Bankruptcy Court's automatic stay, but it is also axiomatic that the Bankruptcy Court in

Maryland is not under any obligation to do so. Judicial actions taken in violation of the

automatic stay are void and without effect, with limited exception not applicable here.

*Middle Tennessee News Co., Inc. v. Charnel of Cincinnati, Inc.*, 250 F.3d 1077, 1082 (7th

Cir. 2001); *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 995 (9th Cir. 2001); *In re*

---

[1] No citation is offered by the *KOB* court for *Yonofsky*.

*Soares*, 107 F.3d 969, 976 (1ˢᵗ Cir. 1997); *In re Smith*, 876 F.2d 524, 526 (6ᵗʰ Cir. 1989). This Court's efforts in execution of judgment against the only remaining Defendant before the Court violate the Bankruptcy Court's automatic stay and are void *ab initio*.  *In re Young*, 193 B.R. 620, 624 n.5 (Bankr. D.D.C. 1996).

**2.      Execution of Judgment against a Decedent Judgment Debtor is prohibited under District of Columbia and Maryland law.**

Even in the District of Columbia, *Rende* only stands to inhibit dismissal for failure to make a substitution.  A judgment creditor is still prohibited by District of Columbia law from proceeding against a dead party in execution of judgment.  Unless there is a federal statute to the contrary, state law, in this case District of Columbia law, controls all federal postjudgment proceedings.  *Mission Bay Campland, Inc. v. Sumner Financial Corp.*, 71 F.R.D. 432, 433 (M.D. Fla. 1976) (quoting Fᴇᴅ R. Cɪᴠ. P. 69).  See also *Apparel Art International v. Amertex Enterprises*, 48 F.3d 576, 582 (1ˢᵗ Cir. 1995) (citing 12 Charles A. Wright & Arthur R. Miller, Fᴇᴅᴇʀᴀʟ Pʀᴀᴄᴛɪᴄᴇ ᴀɴᴅ Pʀᴏᴄᴇᴅᴜʀᴇ § 3012 (1973)).

The substitution requirements of Federal Rule 25 are completely harmonious with District of Columbia probate law.  "Under District of Columbia intestacy laws all property of a decedent passes directly to the personal representative, who thereafter holds legal title for administration and distribution of the estate."  *United States v. Wade*, 992 F. Supp. 6, 11 (D.D.C. 1997) (citing D.C. Cᴏᴅᴇ § 20-105; *Richardson v. Green*, 528 A.2d 429, 432-37 (D.C. 1987)) *reversed on other grounds* 152 F.3d 969 (D.C. Cir. 1998). Accord, citing same, *Dickson v. Mintz*, 634 A.2d 1243, 1246 (D.C. 1993) ("any action respecting a decedent's property requires the appointment of a personal representative").

> No execution shall issue upon nor shall any levy be made against any property of the estate under any judgment against a decedent or a personal representative.  No claim (which is not by its terms secured) shall attach to any particular estate asset, real or personal, whether in the hands of the personal representative or of any *bona fide* purchaser, or to the proceeds from the sale of any such asset.

D.C. CODE § 20-914.

"D.C. Code § 20-901 provides that no claims against a decedent's estate may be revived or begun before the appointment of a personal representative."  *Richardson*, 528 A.2d at 436 (relying on prototype Maryland law as "also instructive").  See *Johnson v. Martin*, 567 A.2d 1299, 1303 n.3 and 1304 (D.C. 1989) (citing MD. ESTATE & TRUSTS CODE § 1-301 (1974); *Campbell v. Welsh*, 460 A.2d 76, 83 (Md. 1983); UNIFORM PROBATE CODE § 3-101).  See also *Douglas v. Lyles*, 841 A.2d 1, 5 n.5 (D.C. 2004) (citing D.C. CODE § 45-401; *Forrest v. Verizon Communications, Inc.*, 805 A.2d 1007, 1012 n.12 (D.C. 2002); *Napoleon v. Heard*, 455 A.2d 901, 903 (D.C. 1983)).

> Appellants next contend that the court erred in refusing to grant them a continuance on August 7, 1989, to permit discovery into the potential claim of after-acquired title... Because Mary Brown died during trial leaving her grandson Carl Jackson as a possible heir at law to part of her estate, appellants desired to pursue this theory to support the retention of title by Yvonne Kinney.  They assert that because no personal representative was appointed for the estate of Mary Brown until August 7, 1989, they were unable to serve formal discovery requests in the period allowed by the trial court (which had continued the case on April 21) and needed an additional opportunity to do so.
> ...
> Although the exact basis for the trial court's denial of the requested continuance is unclear, we find no abuse of discretion for the following reasons. First, as pointed out by appellee, the Probate Reform Act, D.C. Code § 20-105 (1989), operates to vest legal title to all of a decedent's property in the personal representative of the decedent's estate until the conclusion of a judicial distribution of that estate.  See *Richardson v. Green*, 528 A.2d 429, 431 (D.C. 1987).  Thus, at the time of trial, any claim that title legally vested in Yvonne Kinney through Carl Jackson under the doctrine of after-acquired title was unripe since the estate had vested in William Jackson as personal representative and had not yet passed to Carl Jackson as an heir-at-law of Mary Brown.

*M.M. & G., Inc. v. Jackson*, 612 A.2d 186, 190-191 (D.C. 1992).

The District Court's disregard for D.C. Code § 20-914 is without merit.  The District Court asserted that the general language "[n]othing in this section shall affect any action that was commenced against the decedent if the decedent had been duly served with process before death", D.C. Code § 20–903, somehow overrides the very specific language "[n]o execution shall issue upon nor shall any levy be made against any property of the estate under any judgment against a decedent or a personal representative...", D.C. CODE § 20-914.  ECF Docket # 119 at 5-6.  See *Elder v. Smith*, 962 A.2d 1069 (Md. Ct. Spec. App. 2008) (interpreting nearly identical language of MD. CODE ESTATES AND TRUSTS § 8-114 ("[a]n execution or a levy shall not issue nor be made against property of the estate under a judgment against a decedent or a personal representative."))

"[I]t is a commonplace of statutory construction that the specific governs the general."  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)).  "That is particularly true where... 'Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.'"  *RadLAX Gateway Hotel, LLC*, 566 U.S. at 645 (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 519 (1996) (THOMAS, J., dissenting)).  "We typically use *ejusdem generis* to ensure that a general word will not render specific words meaningless."  *Yates v. United States*, 135 S. Ct. 1074, 1086-1087 (2015)  (quoting *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 294 (2011)).  See *Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 698 (1995) (noting "[a] reluctance to treat statutory terms as surplusage").

This law underlies the relevant statutory scheme.  E.T. §§ 8-103 and 8-104 provide for the presentation of claims against an estate. E.T. § 8-105(a) provides for the order of payment of claims.  Section 8-105(b) provides that a "preference shall not be given in the payment of a claim over another claim of the same class."  E.T. §§ 8-110, 8-111, and 8-112 address claims not yet due, secured claims, and contingent claims, respectively.  E.T. § 8-114(a), quoted above, provides that a judgment creditor may not execute a levy to obtain a lien against property of the estate, in order to enforce a judgment.  Nothing in this statutory scheme permits a creditor with a pre-death claim to enhance the priority of its claim after the debtor dies.  In fact, the statutory scheme presumes that a claim's priority status is determined on the date that the decedent dies.

*Elder*, 962 A.2d at 1073 (footnotes omitted).

The District Court cannot nominally proceed in the name of a non-existent co-defendant, particularly in the indisputably distasteful pursuit of a fishing expedition by deposing the sitting attorney for the remaining defendant debtor.  To do so undermines the entirety of the automatic stay statutory regime of the Bankruptcy Code, now imposed against execution of judgment against the sole remaining defendant in the District of Columbia case.  "Congress has not by the enactment of the Bankruptcy Code altered its intent, as found by the Supreme Court, to deprive all but U.S. Bankruptcy Courts of jurisdiction over the property of a debtor seeking relief under federal bankruptcy law." *In re Ricks*, 26 B.R. 134, 136 (Bankr. D. Idaho 1983) (citing 28 U.S.C. §§ 1471, 1471(e) and 11 U.S.C. 362(a)).   "The Supreme Court has consistently proclaimed that the federal bankruptcy power is unrestricted and paramount..."  *In re Nashville White Trucks, Inc.*, 22 B.R. 578, 582 (Bankr. M.D. Tenn. 1982) (citing *Marine Harbor Properties, Inc. v. Manufacturers Trust Co*., 317 U.S. 78, 83 (1942); *International Shoe Co. v. Pinkus*, 278 U.S. 261, 265 (1929)).  "Congress 'may embrace within its legislation whatever may be deemed important to a complete and effective bankrupt system.'"  *In re Nashville White Trucks, Inc.*, 22 B.R. at 582 (quoting *United States v. Fox,* 95 U.S. 670, 672 (1878)).

It cannot be disputed that judgment was entered against Warren in this case in 2015.  There appears to be no dispute that co-defendant Day died in April of this year. All subsequent proceedings have been solely in execution of judgment, which is specifically prohibited against a decedent in the District of Columbia and Maryland.  This Court still disingenuously asserts it is executing judgment against Day.  Warren remains the sole party defendant before the District Court in the District of Columbia proceeding. No other defendant exists.  All proceedings in execution of judgment can only be against the Debtor Warren and remain in violation of the automatic stay.

**3.      The District Court has compelled attorney LeFande to appear for a deposition without personal jurisdiction over him.**

"In this jurisdiction, a local rule, read in consonance with Rule 30(b) of the Federal Rules of Civil Procedure, requires that a notice of deposition be served five days in advance of the date set for taking the deposition."  *Williams v. Johann*s, 03-2245 (CKK/JMF) at 7 (D.D.C. June 14, 2007) (citing LCvR 30.1, now requiring seven days for notice).  LeFande did not voluntarily appear for the September 21, 2017 deposition, he was ordered to do so by the District Court without any claim of service of a subpoena upon him.  See ECF Docket # 115.  Upon being ordered to the witness stand, LeFande stated on the record that he was appearing "under duress" and had not been served.  By being ordered by the District Court to appear regardless of the Court's actual authority to do so, and LeFande asserting this jurisdictional deficiency immediately, there was no waiver of such service.  Compare J*udicial Watch, Inc. v. United States DOC*, 196 F.R.D. 1, 2 (D.D.C. 2000).

"[I]t cannot be seriously argued that one lawyer telling another that he intends to take a deposition is 'service of a notice' of that deposition." *Nuskey v. Lambright*, 251 F.R.D. 3 (D.D.C. 2008) (quoting *Williams*, supra).   Since LeFande was never served, he could not be compelled to appear for a deposition.   "Serving a subpoena requires delivering a copy to the named person..." FED. R. CIV. P. 45 (b)(1).   *Weiss v. Allstate Ins. Co.*, 512 F. Supp. 2d 463, 466 (E.D. La. 2007) ("[S]ervice is improper if the person himself is not served with a copy of the subpoena").

> Any person not a party to this case is a third-party witness, and his or her attendance at a deposition can be compelled only by a subpoena properly issued under Rule 45 of the Federal Rules of Civil Procedure. FED. R. CIV. P. 30(a). Thus, while a court can issue and enforce such a subpoena, I know of no power it has to order employees of the government (or anyone else) to attend a deposition unless such a subpoena is properly served. The Court cannot simply dispose of rules of law that Plaintiffs' counsel finds inconvenient due to his failure to conduct discovery in the time frame allotted.

*Williams* at 9.

LeFande was never served, and this Court has made no attempt to comply with any provisions for substituted service.   "When... a court of the United States undertakes, by its process of contempt, to punish a man for refusing to comply with an order which that court had no authority to make, the order itself, being without jurisdiction, is void, and the order punishing for the contempt is equally void." *Ex parte Fisk*, 113 U.S. 713, 718 (1885).   Accord, *Blackmer v. United States*, 284 U.S. 421, 439-440 (1932).

> There are some situations where violation of a court order may be punished as a criminal contempt even though the order violated is set aside on appeal.  This was recognized in *United States v. United Mine Workers*, 330 U.S. 258, 294 (1947) but, as the Court there emphasized, these are situations "where... the subject matter of the suit, as well as the parties, was properly before the Court" and "where the elements of federal jurisdiction were clearly shown" (330 U.S. at 294, 67 S. Ct. at 696).

*United States v. Holland*, 552 F.2d 667, 675 (5ᵗʰCir. 1977) (parallel citations omitted).

**4.    The District Court's demand for a question by question inquiry as to privilege was improper for the sitting attorney in the same case.**

"The attorney client privilege is one of the oldest recognized privileges for confidential communications." *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888)). "The privilege is intended to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'" *Swidler & Berlin*, 524 U.S. at 403 (quoting *Upjohn Co.*, 449 U.S. at 389).

"The practice of forcing trial counsel to testify as a witness … has long been discouraged … [I]t causes the standards of the profession [to] suffer." *Shelton v American Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986) (internal citations and quotation marks omitted). "[D]eposing an opponent's attorney is a drastic measure and is infrequently proper." *Dunkin' Donuts, Inc. v Mandorico, Inc.*, 181 F.R.D. 208, 209 (D.P.R. 1998). "[D]epositions [of opposing counsel] may lead to the disqualification of counsel who may be called as witnesses … [and] would have a chilling effect on the truthfulness of attorney-client communications." *Kaiser v Mutual Life Ins. Co. of N.Y.*, 161 F.R.D. 378, 381 (S.D. Ind.1994). "[D]epositions of attorneys inherently constitute an invitation to harass the attorney and parties, and to disrupt and delay the case." *West Peninsular Title Co. v Palm Beach County,* 132 F.R.D. 301, 302 (S.D. Fla. 1990). *Shelton* recognizes the heightened protection that must be afforded to protect the trial attorneys representing parties in the same case the depositions are sought to avoid employing the discovery process as an abusive litigation tactic. *Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 730 (8th Cir. 2002).

"The general rule with respect to confidential communications... is that such communications are privileged during the testator's lifetime and, also, after the testator's death unless sought to be disclosed in litigation between the testator's heirs." *Swidler & Berlin*, 524 U.S. at 404 (quoting *United States* v. *Osborn*, 561 F.2d 1334, 1340 (9th Cir. 1977)).

> [W]e think there are weighty reasons that counsel in favor of posthumous application.  Knowing that communications will remain confidential even after death encourages the client to communicate fully and frankly with counsel. While the fear of disclosure, and the consequent withholding of information from counsel, may be reduced if disclosure is limited to posthumous disclosure in a criminal context, it seems unreasonable to assume that it vanishes altogether. Clients may be concerned about reputation, civil liability, or possible harm to friends or family.  Posthumous disclosure of such communications may be as feared as disclosure during the client's lifetime.

*Swidler & Berlin*, 524 U.S. at 407.

> The contention that the attorney is being required to disclose only what the client could have been required to disclose is at odds with the basis for the privilege even during the client's lifetime.  In related cases, we have said that the loss of evidence admittedly caused by the privilege is justified in part by the fact that without the privilege, the client may not have made such communications in the first place.

*Id*. at 408 (citing *Jaffee v. Redmond*, 518 U.S. 1, 12 (1996); *Fisher v. United States*, 425 U.S. 391, 403 (1976)).

> We recognize that circumstances may arise in which the court should order the taking of opposing counsel's deposition. But those circumstances should be limited to where the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel, (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case.

*Shelton*, 805 F.2d at 1327 (citing *Fireman's Fund Insurance Co. v. Superior Court*, 72 Cal. App. 3d 786, 140 Cal. Rptr. 677, 679 (1977)).

District Title made a wide swath of allegations in this attorney's direction, but never attempted to make any kind of *prima facie* case to reach a crime fraud exception to overcome the attorney-client privilege. *In re Grand Jury*, 475 F.3d 1299, 1305 (D.C. Cir. 2007). District Title has already litigated a fraudulent conveyance action against the purchaser of the St. Mary's County property and <u>lost</u>, beyond whatever default was obtained by virtue of Defendant Day's incapacity. The St. Mary's transaction described by District Title occurred before the District Court ordered any kind of limitation upon the Defendants' affairs. As already described, neither Maryland nor District of Columbia could permit execution of judgment against the decedent Day.

From its onset, LeFande represented both Defendants in this particular lawsuit. There is no allegation that whatever transpired between Day and his attorney was not in the context of an attorney client relationship and solely involved communications between Day and his attorney. District Title demanded to immediately delve directly into attorney client communications without any suggestion of a waiver of or exception to the privilege. "Rule 104(a) also applies to preliminary factual determinations underlying application of the crime-fraud exception". *In re Grand Jury*, 705 F.3d 133, 154 (3d Cir. 2012) (citing *Zolin*, 491 U.S. at 565). "Rule 1101(c) provides: 'The rule with respect to privileges ***applies at all stages of all actions, cases, and proceedings*.'" *Zolin*, 491 U.S. at 565 (emphasis added). "Rule 501 of the Federal Rules of Evidence provides that state law supplies the rule of decision on privilege in diversity cases." *Pamida, Inc.*, 281 F.3d at 731.

"Discovery from an opposing counsel is 'limited to where the party seeking to take the deposition has shown that (1) no other means exist to obtain the information...;

(2) the information sought is relevant and nonprivileged; and (3) the information is

crucial to the preparation of the case.'"  *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 278

F.3d 621, 628 (6th Cir. 2002) (quoting *Shelton*, 805 F.2d at 1327).  District Title offered

no evidence supporting a *prima facie* case to overcome the assertion of the privilege.  This

Court does not suggest otherwise.  There has been no suggestion of waiver, instead

exactly the opposite.  See *Ideal Elec. Sec. Co. v. International Fid. Ins. Co.*, 129 F.3d

143, 151-152 (D.C. Cir. 1997).  This assertion that it can simply ignore this privilege

until later asserted at a deposition flies in the face of *Zolin*.   It offers no authorities

whatsoever to the contrary and is outright incorrect as a matter of law as it pertains to a

sitting attorney presently representing a party in litigation.

> We held in *Shelton* that requiring the attorney to answer the questions posed to
> her regarding the existence of certain documents would require her to reveal her
> mental selective process… The *Shelton* test was intended to protect against the
> ills of deposing opposing counsel in a pending case which could potentially lead
> to the disclosure of the attorney's litigation strategy. Because this abuse of the
> discovery process had become an ever increasing practice, this Court erected the
> *Shelton* test as a barrier *to protect trial attorneys from these depositions.*

*United States v. Philip Morris*, 209 F.R.D. 13, 16-17 (D.D.C. 2002) (quoting *Pamida,*

*Inc.,* 281 F.3d at 730-731 (emphasis in *Philip Morris*).  See also *Philip Morris*, 209

F.R.D. at 18 ("*Shelton* [limits] depositions of *trial* counsel or counsel directly involved in

representing a party in the case" (emphasis *sic*) (citing *Nationwide Mut. Ins. Co., v.*

*Home Ins. Co.,* 278 F.3d 621, 628-620 (6th Cir. 2002) (district court did not abuse

discretion in refusing to allow deposition of arbitrators and opposing trial counsel in

ongoing case); *Thiessen v. GE Capital Corp.* 267 F.3d 1095, 1112 (10th Cir. 2001)(no

abuse of discretion as both parties agreed that *Shelton* applied to attorney who was both

"corporate counsel and [] involved as counsel in this case"); *Theriot v. Parish of*

*Jefferson* 185 F.3d 477, 491 (5th Cir. 1999), *cert. denied,* 529 U.S. 1129 (2000) (no abuse

of discretion for barring deposition of "defendants' trial attorneys"); *Boughton v. Cotter*

*Corp.,* 65 F.3d 823, 830 (10th Cir. 1995) (*Shelton* bars deposition of "outside counsel

representing defendants in this matter"); *Gould Incorporated v. Mitsui,* 825 F.2d 676, 680

(2d Cir. 1987) (*Shelton* applies where concern is that the "thought processes of counsel in

relation to pending or anticipated litigation would be exposed."); *Corporation for Public*

*Broadcasting v. American Automobile Centennial Commission,* 97-CV-1810 (D.D.C.

Feb. 2, 1999) ("the district court quoted *Shelton,* and denied without prejudice the request

for the deposition of counsel, one of whom was trial counsel"); *Evans v. Atwood,* 96-

2746 (D.D.C. 1999) (allowed the deposition of an attorney employed by the defendant,

on the grounds that the attorney was not "counsel of record" and therefore the *Shelton*

"considerations had little force in the context of the instant case")).  Accord, *Sterne*

*Kessler Goldstein & Fox, PLLC v. Eastman Kodak Co.*, 276 F.R.D. 376, 380 (D.D.C.

2011) ("Some of the same concerns that animated the *Shelton* test regarding the risks to

and burdens on the attorney-client privilege and work-product doctrine are implicated

when the proposed deponent is former counsel to a party in pending litigation on matters

that are plainly at issue in that litigation, even when the proposed deponent is not

currently opposing trial counsel.")

> [P]ublic policy mandates that they not be compelled to testify.  Discussion of this
> principle--that attorneys should not be compelled to testify against their clients--
> primarily arises in the context of depositions, most likely because the practice of
> calling opposing counsel as a witness at trial is so offensive to our conception of
> the adversarial process.  Courts have made clear that attorneys should, only in rare
> and special circumstances, be forced to testify against their own clients.

*Giannicos v. Bellevue Hospital Medical Ctr.*, 7 Misc. 3d 403, 406 (N.Y. Sup. Ct. 2005).

Courts confronted by demands for counsel depositions have noted a number of concerns that such discovery poses. Allowing depositions of opposing counsel, even if these depositions were limited to relevant and non-privileged information, may disrupt the effective operation of the adversarial system by chilling the free and truthful exchange of information between attorneys and their clients. See *United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, No. 97-cv-6124, 2000 U.S. Dist. LEXIS 12669, at *9-10 (S.D.N.Y. Aug. 31, 2000) ("[d]epositions of counsel, even if limited to relevant and non-privileged information, are likely to have a disruptive effect on the attorney-client relationship and on the litigation of the case," citing *Roznitsky, Schwartz Cobb & Scheinert*, No. 98-cv-6643, 1999 U.S. Dist. LEXIS 4449, at *5 (S.D.N.Y. Apr. 6, 1999)).  Undermining attorney-client communications due to the risk that counsel may be compelled to testify at a deposition in a pending or future "scorched earth" litigation is certainly not helpful to effective legal practice. See [*Hickman v. Taylor*, 329 U.S. 495, 510-511 (1947)] ("[I]t is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests."); *Wilson v. Scruggs*, No. 3:02-cv-525, 2003 U.S. Dist. LEXIS 27953, 2003 WL 23521358, at *1 (S.D. Miss. Apr. 10, 2003) ("[D]epositions of opposing counsel . . . disrupt the adversarial process and lower the standards of the profession . . . . Thus, a party should not be permitted to take the deposition of another party's attorney except in the most unusual of circumstances.") (internal citations omitted); *Qad.inc v. ALN, Assoc., Inc.*, 132 F.R.D. 492, 494 (N.D. Ill. 1990) (declining to apply the *Shelton* test, but recognizing that "the taking of a lawyer's deposition poses the potential for invasion of client confidences and secrets . . . and also for invasion of lawyer thought processes...").  A second concern is that depositions of opposing counsel present a "unique opportunity for harassment." *Marco Island Partners v. Oak Dev. Corp.*, 117 F.R.D. 418, 420 (N.D. Ill. 1987); see also *Shelton*, 805 F.2d at 1330 ("The harassing practice of deposing opposing counsel (unless that counsel's testimony is crucial and unique) appears to be an adversary trial tactic that does nothing for the administration of justice but rather prolongs and increases the costs of litigation, demeans the profession, and constitutes an abuse of the discovery process."); *Simmons Foods, Inc. v. Willis*, 191 F.R.D. 625, 630 (D. Kan. 2000) ("[E]xperience teaches that countenancing unbridled depositions of attorneys often invites delay, disruption of the case, harassment, and unnecessary distractions into collateral matters.") (internal citations omitted).  Closely related to this second concern is that the time involved in preparing for and undergoing such depositions will disrupt counsels' preparation of parties' cases and thus decrease the overall quality of representation.  See *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 70 (2d Cir. 2003) ("Courts have been especially concerned about the burdens imposed on the adversary process when lawyers themselves have been the subject

of discovery requests, and have resisted the idea that lawyers should routinely be subject to broad discovery."); *Shelton*, 805 F.2d at 1327 (depositions of opposing counsel "not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and costs of litigation."); *Jennings v. Family Mgmt.*, 201 F.R.D. 272, 276-77 (D.D.C. 2001) ("[C]ourts regard attorney depositions unfavorably because they may interfere with the attorney's case preparation and risk disqualification of counsel who may be called as witness."); *Philip Morris*, 209 F.R.D. at 17 (stating that Shelton "addressed a troubling and real-world discovery problem"); *Evans v. Atwood*, No. 96-cv-2746, 1999 U.S. Dist. LEXIS 17545, 1999 WL 1032811, at *2 (D.D.C. Sept. 29, 1999) ("[The] presumption against attorney depositions is that depositions of counsel, even if limited to relevant and non-privileged information, are likely to have a disruptive effect on the attorney-client relationship and on the litigation of the case.").  A third concern... is that such depositions may lead to the disqualification of counsel who may be called as witnesses.  See *Marco Island*, 117 F.R.D. at 420; *Jennings*, 201 F.R.D. at 276-77.  Finally, chief among the concerns cited by federal courts, is that counsel depositions carry the substantial potential of spawning litigation over collateral issues related to assertion of privilege, scope, and relevancy, that only end up imposing additional pretrial delays and costs on both parties and burdens on the courts to resolve work-product and privilege objections.  See *Shelton*, 805 F.2d at 1327 ("It is not hard to imagine additional pretrial delays to resolve work-product and attorney-client objections, as well as delays to resolve collateral issues raised by the attorney's testimony."); *M & R Amusements Corp. v. Blair*, 142 F.R.D. 304, 305 (N.D. Ill. 1992) ("Deposing an opponent's attorney is a drastic measure. It not only creates a side-show and diverts attention from the merits of the case, its use also has a strong potential for abuse. Thus, a motion to depose an opponent's attorney is viewed with a jaundiced eye and is infrequently proper."); *Walker v. United Parcel Servs.*, 87 F.R.D. 360, 362 (E.D. Pa. 1980) (denying leave to depose defendant's counsel and stating that the deposition would "occasion significant [] delays" and "[f]urther controversies over privilege and work product claims would inevitably require further imposition on the resources of the Court and provide the potential for undue delay.").

*Sterne Kessler Goldstein & Fox*, PLLC, 276 F.R.D. at 380-382.

A significant problem that *Shelton* sought to restrict was an effort to preview an opponent's litigation strategy simply by noticing the deposition of opposing counsel. Indeed, "counsel's tasks in preparing for trial would be much easier if he could dispense with interrogatories, document requests, and depositions of lay persons, and simply depose opposing counsel in an attempt to identify the information that opposing counsel has decided is relevant and important to his legal theories and strategy."

*Sterne Kessler Goldstein & Fox, PLLC*, 276 F.R.D. at 384 (quoting *Shelton*, 805 F.2d at 1327).

> This is exactly the type of fishing expedition that courts have attempted to prevent when seeking to deter deposition of counsel. Kodak does not state what information it seeks to elicit from the petitioner, what benefit that information would provide, or the defenses (other than the proposed inequitable conduct defense) for which it seeks information.  While Federal Rule of Civil Procedure 30 does not explicitly prohibit deposition of an opposing party's counsel, attorneys are not typical fact-witnesses. ***Attorneys are under strict obligations to their client to preserve confidential information, protect their clients' interests, and prevent disclosure of privileged attorney-client communications or other information obtained during the representation that could harm the client.*** Deposing an opposing party's former counsel on the same matter at issue in the pending litigation, should not be done lightly.

*Id*. at 384-385 (emphasis added).

As this Court has observed, Attorney LeFande has already done everything in his power to avoid this confrontation and preserve his dead client's confidences.  And as LeFande's attorney has already stated to the Court, LeFande maintains a higher duty to his client than to this Court in this regard.  *Dike v. Dike*, 448 P.2d 490, 499 (Wash. 1968).

> The privilege of confidential communication between client and attorney should be regarded as sacred.  It is not to be whittled away by means of specious argument that it has been waived.  Least of all should the courts seize upon slight and equivocal circumstances as a technical reason for destroying the privilege. Here the attorney was compelled to testify against his client under threat of punishment for contempt.  Such procedure would have been justified only in case the defendant with knowledge of his rights had waived the privilege in open court or by his statements and conduct had furnished explicit and convincing evidence that he did not understand, desire or expect that his statements to his attorney would be kept in confidence.  Defendant's attorney should have chosen to go to jail and take his chances of release by a higher court.  This is not intended as a criticism of the action of the attorney.  It is, however, a suggestion to any and all attorneys who may have the misfortune to be confronted by the same or a similar problem.

*People v. Kor,* 129 Cal. App. 2d 436, 447 (1954).

5.      **The demand for LeFande's deposition was brought for an improper purpose.**

District of Columbia Rule of Professional Conduct 8.4 states "[i]t is professional

misconduct for a lawyer to... (g) Seek or threaten to seek criminal charges or disciplinary

charges solely to obtain an advantage in a civil matter."

> It appears that we have no cases discussing what discipline should be imposed, as
> an original matter, for contacting a represented party and making analogous
> intimidating and extortionary statements.  But in *In re Ras*, 884 A.2d 44 (D.C.
> 2005), we imposed a one-year suspension as reciprocal discipline where another
> jurisdiction determined that the attorney had, *inter alia*, communicated with a
> represented party and threatened to pursue criminal charges to gain advantage in a
> civil matter.

*In re Chaganti*, 144 A.3d 20, 27 (D.C. 2016).

> The civil adjudicative process is primarily designed for the settlement of disputes
> between parties, while the criminal process is designed for the protection of
> society as a whole.  Threatening to use, or using, the criminal process to coerce
> adjustment of private civil claims or controversies is a subversion of that process;
> further, the person against whom the criminal process is so misused may be
> deterred from asserting his legal rights and thus the usefulness of the civil process
> in settling private disputes is impaired.  As in all cases of abuse of judicial
> process, the improper use of criminal process tends to diminish public confidence
> in our legal system.

*Donohoe v. Burd*, 722 F. Supp. 1507, 1521 (S.D. Ohio 1989) (quoting Ohio Ethics Code

7-21).

District Title has intentionally driven a wedge between this attorney and the

remaining indigent co-Defendant, in order to deprive that party of legal representation in

a manner violative of the well-established Rules of Professional Conduct.  Given the

passage of more than two years since the transaction complained of, and District Title's

own knowledge of this transaction for more than an year, it is plainly evident this motion

is now brought for "purely strategic purposes" to improperly deprive the remaining

Defendant of "the right of one to retain counsel of [her] choosing".  *Tessier v. Plastic*

*Surgery Specialists, Inc.*, 731 F. Supp. 724, 729 (E.D. Va. 1990) (citing *Smith v. Whatcott*, 757 F.2d 1098, 1099-1100 (10th Cir. 1985); *Melamed v. ITT Continental Baking Co.*, 592 F.2d 290, 295 (6th Cir. 1979); *International Electronics Corp. v. Flanzer*, 527 F.2d 1288, 1289 (2d Cir. 1975)).  This Court "should not be oblivious to this fact." *Id*.  Given the great deal of time which has passed since District Title claimed to be aware of these facts and this plainly evident delay by District Title, it is difficult to understand that the District Court could find to the contrary, that somehow, District Title has not "had ample opportunity to obtain the information by discovery in the action".

There is simply no foundation to claim that the remaining Defendant could not seek a protective order in *anticipation* of a discovery request.  Indeed, the request for the protective order was made in response to District Title's request for a subpoena to be issued to the attorney.  A request for a protective order is an appropriate response to such a request.  See, *e.g.*, *Fernandez v. Kash N' Karry Food Stores, Inc.*, 136 F.R.D. 495, 496 (M.D. Fla. 1991).  A party moving for a protective order only need demonstrate good cause.  For good cause to exist, the parties seeking protection must show that specific prejudice or harm will result if no protective order is granted.  See *Frideres v. Schiltz*, 150 F.R.D. 153, 156 (S.D. Iowa 1993).  A valid claim of privilege is considered "good cause" to justify a protective order.  *Navajo Nation v. Peabody Holding Co.*, 209 F. Supp. 2d 269, 283 (D.D.C. 2002), *aff'd*, 64 Fed. App'x 783 (D.C. Cir. 2003).

Attorney LeFande has stated unequivocally he will not testify about confidences shared with his dead client.  He has further asserted a Fifth Amendment privilege regarding allegations of transferring money from the St. Mary's County real estate transaction before there was any preliminary injunction in place.  Yet, this Court

remained intent on interfering with LeFande's representation of the remaining Defendant

and subjecting him to the wholly inappropriate spectacle which transpired in court on

September 21, 2017.

Judge Facciola appears to have had a far more reasoned response to this same

situation.

> All discovery is subject to a balancing calculus, wherein its utility is weighed
> against its cost.  FED. R. CIV. P. 26(b)(2)(C)(iii)...  If I know anything about
> lawyers, the notion that defendants' counsel will secure additional and fatal
> admissions from opposing counsel is a pipe dream.
>
> More significantly, Doyle will likely not answer any questions, and will be
> justified in doing so...  It is impossible for the answers to be anything but her
> protected work product, for her thoughts on those topics are obviously her
> "mental impressions, conclusions, opinions, or legal theories."  FED. R. CIV. P.
> 26(b)(3)(B).  In light of that, I find defendants' assurances to Doyle that their
> deposition questions will not invade her work product to be hollow; how can one
> ask a lawyer her views as to the validity of the positions she took, and will take,
> on behalf of a client without invading her work product?
> ...
> I cannot bring myself to spend the taxpayers' money presiding over a deposition
> where I anticipate sustaining objection after objection. Thus, plaintiffs' motion for
> a protective order will be granted...

*Harris v. Koenig*, 02-618 (GK/JMF) at 13 (D.D.C. Dec. 2, 2010).


**6.**     **Further discovery on the St. Mary's transaction remains inappropriate.**

District Title appears to claim that it is using this discovery in execution of

judgment.  As discussed below, this is itself unlawful.  Yet, if this is the case, it is

pursuing money that was alleged to be transferred almost three years ago to a venue in

which execution of judgment would be beyond the authority of the District Court to

enforce.  There has been no domestication of any final judgment of the District Court in

the New Zealand Courts, nor would it appear that there is any intention to do so by District Title.

If there is a claim of discovery of execution in judgment, as to this particular transaction in 2014, it is plainly disingenuous as to any expectation that money is present in New Zealand or that such funds could be recovered in execution.[2]  This is not the St. Mary's case, and this is not the venue for any such discovery to be taken.  District Title now uses the present closed lawsuit to backdoor discovery requests for a failed fraudulent conveyance action in Maryland.  District Title has no legitimate purpose in demanding information about the Scotland, Maryland transaction in this case, and has no expectation of receiving useful evidence in response.

This attorney's file reveals **no less than twenty-eight distinct discovery requests in at least three different proceedings**.  District Title forced the District Court to conduct another discovery hearing for oral examinations of third persons by Magistrate Robinson on May 4, 2016, but despite having been granted the examinations at that hearing, **District Title has never conducted them**.  Once again, there appears to be no interest or urgency on the part of the Plaintiff to use any of these discovery mechanisms for any legitimate fact finding function, but instead to solely undermine this attorney's representation of the remaining Defendant.  It certainly seems the magistrate has turned a blind eye to these repeatedly asserted facts in cursorily claiming it is "readily apparent that Mr. LeFande has done no more than recite these rules".  ECF Docket # 110 at 8.

---

[2]   Indeed, what is quite obvious to even the most casual observer is the Scotland Maryland property, Anita Warren's prior residence and long time held in the Defendants' family, was instead **completely free of any taint of the money** purportedly retained from the District of Columbia transaction.

Gucci knew of its need for information on sales to foreign purchasers well before
the fact discovery deadline.  Gucci had "ample opportunity to obtain the
information" during the fact discovery period, and failed to raise the issue with
the Court at the appropriate time.  FED. R. CIV. P. 26 (b)(2)(C)(ii).  Now, having
made an untimely application, Gucci has made a request to reopen fact discovery
that presents a burden on Defendants not likely to be outweighed by the benefits
of additional discovery, and that does not meet the good cause requirement.
Gucci's request to move for a court order to compel production of all sales and
cost information for each allegedly infringing product is therefore denied as
untimely.

*Gucci America, Inc. v. Guess?, Inc.*, 790 F. Supp. 2d 136, 142 (S.D.N.Y. 2011).  Accord,

*Barnes v. D.C.*, 289 F.R.D. 1, 23 (D.D.C. 2012) (quoting *Gucci America*).

"Where a party is aware of the existence of documents or other information

before the close of discovery and propounds requests after the deadline has passed, those

requests should be denied."  *Gucci America, Inc.*, 790 F. Supp. 2d  at 140 (citing, *inter*

*alia*, *Pretty v. Prudential Insurance Co. of America*, 696 F. Supp. 2d 170, 178 (D. Conn.

2010)).  District Title has had "ample opportunity to obtain the information" by discovery

in the course of this action and has now lost the St. Mary's County case at a jury trial.

The District Court should now be directed to dismiss any proceedings against him, and

prohibit any further discovery, particularly that which improperly intrudes upon the

confidences between this attorney and the Defendants.


**7.      The Magistrate Judge has violated the Fifth Amendment.**

On September 21, 2017, LeFande asserted his right to remain silent and refused to

testify.  The Magistrate Judge found LeFande in contempt and fined him five thousand

dollars.  "[T]he Fifth Amendment guarantees against federal infringement -- the right of a

person to remain silent unless he chooses to speak in the unfettered exercise of his own

will, and to suffer no penalty... for such silence."  *Spevack v. Klein*, 385 U.S. 511, 514

(1967).  "In this context 'penalty' is not restricted to fine or imprisonment.  It means... the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly.'"  *Id.*  at 515 (quoting *Griffin v. California*, 380 U.S. 609, 615 (1965)).

> It is recognized that allowing a civil case to proceed against a defendant who also may be subject to criminal prosecution involving the same matter may undermine the defendant's Fifth Amendment privilege.  See *Cruz v. County of Dupage*, 1997 U.S. Dist. LEXIS 9220, No. 96 C 7170, 1997 WL 370194, * 1-2 (N.D. Ill. June 27, 1997) (Coar , J.), quoting *Securities & Exchange Comm'n v. Dresser Indus., Inc.*, 202 U.S. App. D.C. 345, 628 F.2d 1368, 1376 (D.C. Cir. 1980).  Such a situation forces the defendant to choose between defending the civil lawsuit and abandoning his Fifth Amendment rights.

*Hobley v. Burge*, 225 F.R.D. 221, 225 (N.D. Ill. 2004).

The entire video deposition fiasco on September 21, 2017 is uniformly suspect.  District Title had already lost its claims of a fraudulent conveyance in a jury trial in its Maryland state court action back in December 2016.  There was no legitimate purpose in eliciting testimony for that cause of action and this Court remains without jurisdiction to hear that case in review.  The examination of a wire transfer from two and a half years ago can hardly be considered useful to collect such money at this late date in a foreign country where District Title has made no effort to domesticate its judgment there.  District Title has done little or nothing to pursue other venues of discovery.  Instead, it remains evident that District Title and its attorneys had no meaningful purpose in proceeding with the deposition other than to embarrass the sole remaining Defendant's trial attorney, interfere with his representation of the Defendant and punish the attorney for defending the case.

"[V]ideotapes are subject to a higher degree of potential abuse than transcripts."  *Hobley*, 225 F.R.D. at 226 (citation omitted).  In this internet age, this Court would have no control over the dissemination of the video once it passed through the courtroom

  
doors.   "The video of a person repeatedly invoking the Fifth Amendment in response to a series of questions is indeed striking..." *Id*.   Given the complete absence of the District Court authority to proceed and the completely inappropriate manner in which it did so, Attorney LeFande was completely correct to refuse to participate from the onset.  He has raised these objections at every opportunity.  In turn, the District Court did everything it could to game the timing of the deposition to deprive LeFande of any meaningful review of the issue by a higher court prior to the damage done.  See Minute Orders of September 15 and 21, 2017, ECF Docket # 115, 116 and 119.  Neither District Title nor the Court made any effort to overcome this issue as might be provided by 18 U.S.C. § 6002 or other applicable law, simply because the deposition was solely intended an abuse of the litigation process and not a part of any legitimate fact finding function.

"Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods, is within the condemnation of [those Amendments]..." *Malloy v. Hogan*, 378 U.S. 1, 8 (1964) (quoting *Boyd* v. *United States*, 116 U.S. 616, 630 (1886)).


## CONCLUSION

For these reasons, and for such other reasons as the Court finds to be good and sufficient cause, the magistrate judge's Orders of September 21 and 27, 2017 must be VACATED, and the Plaintiff's Motion for this attorney to show cause and for further discovery DENIED.

Respectfully submitted, this third day of October, 2017.

_____
Horace L. Bradshaw, Jr.
Attorney at Law
1644 6th Street NW
Washington DC 20001
(202) 737-8774
Fax (202) 772-0880
horacebradshawesq@gmail.com
D.C. Bar Number 446575
Attorney for Matthew LeFande